## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| LARRY LEE HIMES, | |
| Plaintiff, | Case No. 3:19-cv-00215 |
| v. | Judge Aleta A. Trauger |
| PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY (a/k/a UNUM GROUP CORPORATION), | |
| Defendant. | |

## MEMORANDUM

In early 1996, pro se Plaintiff Larry Lee Himes began suffering from severe gastrointestinal problems and sensitivity to odors allegedly caused by the high-dose chemotherapy and stem cell transplant he received to treat non-Hodgkin's lymphoma. (Doc. No. 1). When those conditions prevented Himes from continuing his work as an accountant for Southwestern/Great American, Inc., he applied to collect disability insurance benefits from Defendant Provident Life and Accident Insurance Company (a/k/a Unum Group) under a plan that he obtained through his employer. (*Id.*) Himes began receiving benefits in February 1996, but Provident terminated those benefits six months later in August 1996. (*Id.*)

Himes administratively appealed that decision multiple times without success. (*Id.*) However, in 2007, Provident reviewed Himes's claim as part of a regulatory settlement agreement entered into with the United States Department of Labor and various state governments who had sued Provident "for its unlawful claims assessment practices when reviewing disability claims."

(*Id.* at PageID# 4). Provident reversed its 1996 termination decision, awarded Himes his unpaid benefits with interest, and reinstated his benefits moving forward. (Doc. No. 1).

Himes received regular benefit payments until Provident again terminated his award on March 27, 2017. (*Id.*) Himes filed this action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B), on March 8, 2019, seeking reinstatement of his benefits and an award of unpaid benefits plus interest. (*Id.*) Himes filed a motion to include missing documents from the administrative record and to supplement the administrative record (Doc. No. 25), to which Provident filed a response (Doc. No. 26), and Himes filed a reply (Doc. No. 27). Himes also filed a motion for judgment on the administrative record and supporting memorandum of law (Doc. Nos. 28-29), alleging that his benefits were wrongfully terminated. Provident has responded in opposition (Doc. No. 30), and Himes filed a reply (Doc. No. 31). For the reasons that follow, Himes's motion to supplement the record and motion for judgment will be denied.

## I.    Background

### A.    Plan Provisions

The plan relevant to this action was issued on May 22, 1991, and, in exchange for monthly premiums, provides for payment of insurance benefits upon a showing of "total disability." (Doc. No. 24, AR 6).[1] Under the plan, the meaning of that term changes with time. Before a claimant turns fifty-five or has received benefits for ten years for a period of disability, whichever is later, he is considered totally disabled if he is (1) unable to perform the substantial and material duties

---

[1]    The transcript of the Administrative Record (Doc. No. 24 and attachments thereto 1-18) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

of his occupation and (2) receiving treatment from a physician that is appropriate for the condition causing the disability. (*Id*., AR 8). After the claimant turns fifty-five or has received benefits for ten years for a period of disability, whichever is later, he is considered totally disabled if he continues receiving appropriate medical treatment and is not able to engage in any gainful employment consistent with his education, training, or experience. (*Id*.) The plan states that Provident will waive the treatment condition during either time period "when continued care would be of no benefit" to the claimant (*Id*.) It also states that, while a claim is pending, Provident has "the right to have [the claimant] examined as often as is reasonable" at its own expense. (*Id*., AR 15).

To receive benefits, a claimant must submit a notice of claim within twenty days after a covered loss begins. (*Id*., AR 14). Upon receiving a notice of claim, Provident is required to send the claimant "claim forms for filing proof of loss," but, if the forms are not given to the claimant within fifteen days, the claimant will meet the proof of loss requirements by giving Provident a written statement of the nature and extent of his loss. (*Id*.) Regarding proof of loss, the plan states:

> If the policy provides for periodic payment for a continuing loss, you must give us written proof of loss within 90 days after the end of each period for which we are liable. For any other loss, written proof must be given within 90 days after such loss.

> If it was not reasonably possible for you to give written proof in the time required, we will not reduce or deny the claim for this reason if the proof is filed as soon as reasonably possible. In any event, the proof required must be furnished no later than one year after the 90 days unless you are legally unable to do so.

(*Id*.) After receiving written proof of loss, Provident will pay monthly all benefits due. (*Id*., AR 15).

**B.  Factual History and Administrative Record**[2]

Himes is a certified public accountant and began working for Southwestern/Great American, Inc., in 1985. (Doc. No. 1, at ¶ 3). Southwestern offered its employees the disability insurance benefit plan at issue in this action, which Himes purchased in 1990. (*Id*. at ¶ 4). In January 1994, Himes was diagnosed with non-Hodgkin's lymphoma and began a six-month chemotherapy regimen. (*Id*. at ¶ 5). Himes worked full-time during that period. (*Id*.) The cancer returned, and Himes began another round of chemotherapy in November 1995, at which point he was unable to continue working. (*Id*. at ¶¶ 6-7).  In January 1996, Himes received increased doses of chemotherapy and a stem cell transplant. (*Id*. at ¶ 6). On February 28, 1996, Provident awarded Himes long-term disability (LTD) benefits, noting a diagnosis of lymphoma. (Doc. No. 24-5, AR 1558; Doc. No. 24-4, AR 1269).

An April 29, 1996 Attending Physician's Statement (APS), signed by oncologist Dr. Michael Magee, indicated lymphoma as the current diagnosis/impairment alleged to underlie the claimed disability and noted that Himes was recovering from a stem cell transplant. (Doc. No. 24-4, AR 1262). On July 8, 1996, Dr. Magee's APS listed Himes's current occupational restrictions and limitations as weakness, fatigue, and anxiety. (*Id*., AR 1251). On July 25, 1996, Dr. Magee noted on the APS that Himes could return to work on a full-time basis on August 5, 1996. (*Id*., AR 1249). Provident terminated Himes's LTD benefits in August 1996. (Doc. No. 24-6, AR 1891, 1931-32, 1935).

---

[2]      The factual history that follows is drawn primarily from the Administrative Record. Himes's complaint is referenced only to provide biographical information and factual context and is not relied upon in deciding Himes's motion for judgment.

Himes applied for Social Security benefits, and on January 23, 1997, the Social Security Administration (SSA) found Himes to be disabled based on a primary diagnosis of "malignant neoplasm of lymphoid and histiocytic tissue/Hodgkin's disease." (Doc. No. 24-1, AR 415). No secondary diagnosis was established due to lack of medical evidence in the file. (*Id.*) On May 4, 2000, the SSA updated its disability finding by continuing disability benefits based on the primary diagnosis of somatoform disorders,[3] with a secondary diagnosis of history of neoplasm of lymphoid and histiocytic tissue/Hodgkin's disease. (*Id.*, AR 416).

On August 5, 2002, Provident denied Himes's appeal of Provident's decision to terminate his LTD benefits in August 1996. (Doc. No. 24-3, AR 979-82). Himes continued to appeal Provident's decision, but his letters of appeal were again denied on July 24, 2003, and August 28, 2003. (*Id.*, AR 983-96).

However, in 2004, Unum entered into a Regulatory Settlement Agreement (RSA) with the United States Department of Labor and other multi-state jurisdictions that allowed for reassessment of certain claims previously denied and/or terminated. (Doc. No. 21, at ¶ 12).; *see also In re UnumProvident Corp. ERISA Benefits Denial Actions*, No. 1:03-CV-1000, 2010 WL

---

[3]      Somatoform denotes "physical symptoms that cannot be attributed to organic disease and appear to be of psychic origin. *Dorland's Illustrated Medical Dictionary* 1734 (32nd ed. 2012). Somatoform disorder "is a form of mental illness that causes one or more bodily symptoms, including pain. The symptoms may or may not be traceable to a physical cause including general medical conditions . . . . The symptoms can involve one or more different organs and body systems, such as: Pain[,] Neurologic problems[,] Gastrointestinal complaints[,] [and] Sexual symptoms[.] Many people who have SSD will also have an anxiety disorder. People with SSD are not faking their symptoms. The distress they experience from pain and other problems they experience are real, regardless of whether or not a physical explanation can be found." https://www.webmd.com/mental-health/somatoform-disorders-symptoms-types-treatment#1 (last viewed January 27, 2021)

323191, at *1 (E.D. Tenn. Jan. 19, 2010) ("UnumProvident entered into a multi-state regulatory settlement agreement ('RSA') with the Department of Labor ('DOL') and insurance regulators from Maine, Massachusetts and Tennessee. . . . The RSA became effective on December 20, 2004 and has been signed by 48 of the state or territorial insurance commissioners. The RSA provides, under the supervision of the DOL and state insurance commissioners, UnumProvident agreed to make certain changes to their claims handling practices and to re-review Plaintiffs' claims under those new practices."); *Sconiers v. First Unum Life Ins. Co.*, 830 F. Supp. 2d 772, 783 (N.D. Cal. 2011) ("Lawsuits and large-scale investigations have revealed that for at least a decade starting in the mid-1990s Unum systematically engaged in bad-faith practices designed to wrongfully limit and deny benefits to ERISA plan participants." (citation omitted)); *Radford Tr. v. First Unum Life Ins. Co. of Am.*, 321 F. Supp. 2d 226, 247 (D. Mass. 2004) (collecting cases for the proposition that Provident's conduct "reveal[ed] a disturbing pattern of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics"), *rev'd in part*, 491 F.3d 21 (1st Cir. 2007); John H. Langbein, *Trust Law as Regulatory Law: the Unum/Provident Scandal and Judicial Review of Benefit Denials Under ERISA*, 101 Nw. U. L. Rev. 1315, 1320–21 (2007) (providing an overview of the investigations that led to the regulatory settlement). Himes allowed Provident to access SSA's file on April 30, 2007, in connection with the 2007 reassessment. (Doc. No. 24-5, AR 1574-75). In August 2007, after reassessing Himes's case, Provident awarded him unpaid benefits with interest dating back to 1996 and reinstated his benefits moving forward. (Doc. No. 24-3, AR 913; Doc. No. 24-12, AR 3495, 3576-81).

In Provident's August 14, 2007 letter notifying Himes of the reinstatement of LTD benefits, Provident noted Himes's claim that he continued to suffer from the lingering effects of

chemotherapy, including gastrointestinal problems and odor sensitivity. (Doc. No. 24-12, AR 3579). In reassessing Himes's claim, Provident considered the policy, the entire claim file, and all of the information and material submitted with Himes's reassessment information form. (*Id.*, at AR 3580). In examining Himes's award of Social Security benefits, Provident noted that "benefits were awarded on the diagnosis of Lymphoma and co-morbid conditions which were a result of the Lymphoma and treatment for the same." (*Id.*) Provident concluded that it was "overturning the previous decision at this time", "[b]ased on the totality of the evidence and giving significant weight to the decision made by the Social Security Administration." (*Id.*) Provident informed Himes that he would "continue to receive a monthly disability benefit . . . as long as [he] continue[d] to meet the provisions of [his] policy," and that he would "be required to provide periodic updates in order to determine [his] continued eligibility for benefits." (*Id.*, at AR 3581). Provident also informed Himes that his "claim was reviewed under the claim reassessment process established in accordance with the terms of the Regulatory Settlement Agreement (RSA) which concluded a multi-state market conduct examination," and that the "RSA established specific procedures for both the reassessment of certain claims and the monitoring of the assessment decision making process." (*Id.*)

On September 14, 2007, Provident sent Himes a letter stating, in part, as follows:

> Your claim is now being handled in the Extended Duration Unit (EDU). As a result, at this time we will no longer require monthly forms, instead, we are going to request that you complete [your] Claimant's Supplemental Statement and Authorizations on a semi-annual basis. You will also be asked to have an updated Attending Physician's Statement submitted on an annual basis.
>
> . . . .

7

**Please also note that by relaxing the policy requirements regarding the completion of monthly forms, we are not waiving our rights under the policy to request at a later date, monthly reports if we deem necessary.** Additionally, we do reserve the right, as outlined in the provisions of your policy, to return your file to the appropriate impairment unit at any point for further investigation. This may result in an increase of the frequency of the required Claimant's Supplemental Statements, Authorization and Attending Physician's Statement forms.

Thus, we are not waiving any of our rights under the policy. We reserve the right to periodically request additional information, including but not limited to medical records, financial documentation and/or occupational information, as we deem it to be necessary and in accordance with the provisions of your policy. For example, you may be asked to meet with one of our local Field Representatives on occasion or attend an IME if we deem it appropriate. This would allow us to obtain updated information regarding your claim.

(*Id*., AR3582-83 (emphasis in original)).

In response, Himes sent Provident a letter dated September 21, 2007, objecting to any requirements mentioned in the September 14, 2007 letter as applying to him because it had been more than ten years since he had developed disabling health problems that prevented him from being able to return to work, and he had therefore met the plan's waiver provision. (Doc. No. 24-5, AR 1528-29). Himes stated that he expected Provident to waive the annual APS requirement consistent with the plan provision stating that Provident "will waive [the requirement of ongoing physician care] when continued care would be of no benefit . . . ." (*Id*.) On October 11, 2007, Provident responded that, although it could not "completely waive the required annual Attending Physician Statement[,]" it would "reduce the frequency to bi-annually at this time," and that "[t]he next bi-annual Physicians Supplemental Statement will be requested in October 2009."[4] (*Id*., at

---

[4]     "Biannual" can mean occurring twice a year or in a biennial sense, i.e., occurring every two years. https://www.merriam-webster.com/dictionary/biannual (last viewed January 27, 2021). Based upon the context of the letter, Provident used "biannually" as meaning occurring every two years.

AR 1527). Provident further stated, "Please be advised that by relaxing the policy requirements regarding the completion of the Attending Physician's Statements, we are not waiving our rights under the policy to request these reports at a later date, if we deem them to be necessary." (*Id.*)

Himes later submitted to Provident an APS signed November 4, 2009, by Dr. Habib Doss, who stated that Himes could engage in activities "as tolerated," noting that he had "problems with all activities due to gastrointestinal problems." (Doc. No. 24-1, AR 62). As to when Dr. Doss expected improvements in these limitations, he wrote "unknown." (*Id.*) In the 2009 update packet, Himes identified two treating physicians, Dr. Doss, whom he last saw in May 2005, and Dr. Joshua Smithson, an internist, whom he last saw in October 2007. (*Id.*, at AR 66, 133). At the time of the 2009 update, no visits were scheduled with either physician. (*Id.*, AR 66).

In April 2012, Himes spoke with a Provident employee and again requested that Provident waive the plan's ongoing-care requirement. (*Id.*, AR 85-86). In a letter dated May 2, 2012, Provident stated that it had decided "to waive the periodic requirement for a completed Attending Physician Statement" and would instead "continue to request that [Himes] complete the Claimant's Statement and Authorization portions of the Individual Disability Status Update once a year," which would be sent in April. (*Id.*, AR 109). The letter also included the following caveat: "In relaxing the policy requirements regarding the periodic completion of the Attending Physician Statement, we are not waiving any of our rights under the policy, including the right to require completion of an Attending Physician Statement at a later date, if deemed necessary." (*Id.*) From 2012 to 2016, Himes submitted his annual individual disability status update form. (*Id.*, AR 112-15, 184-90, 222-28, 238-44, 262-68). Those forms indicated that Himes was not receiving active care from a physician. (*Id.*)

9

On February 11, 2015, Himes turned fifty-five, triggering a change in the plan's definition of his total disability. (*Id.*, AR 306; Doc. Nos. 1 and 21, at ¶ 23). On May 31, 2016, Provident informed Himes that it would be evaluating his claim under the new definition of disability and would notify him in writing "as we need additional information for the continuing evaluation of your claim." (Doc. No. 24-1, AR 306). Under the new definition, Himes is considered totally disabled if he is unable "to engage in any gainful occupation in which [he] might reasonably be expected to engage because of education, training, or experience," and he is receiving care from a physician that is appropriate for the conditions rendering him disabled. (Doc. No. 24, AR 8). As a result of the change, on August 12, 2016, Provident asked Himes to submit an attending physician statement. (Doc. No. 24-1, AR 313). Himes responded that Provident had waived the requirement that he submit such statements in 2012. (*Id.*, AR 338, 370). In additional communications, Provident repeated its request, asserting that Himes's annual individual disability status update did not qualify as proof of loss under the plan. (*Id.*, AR 374-76). Himes did not submit an attending physician statement. (*Id.*, AR 380-83). Himes also refused to submit an SSA authorization form, stating that there was no provision in the plan requiring such an authorization. (*Id.*, AR 381).

In a November 21, 2016 letter, Provident stated, among other things, the following:

> The information available to us reflects that you last received treatment for Non-Hodgkin's Lymphoma in January 1996 and that you continue to be in remission and are not undergoing any treatment for Non-Hodgkin's Lymphoma. This was noted on the last Attending Physician's Statement we received which was completed by your Oncologist, Dr. Habib Doss, on November 04, 2009. Dr. Doss indicated that you are able to do activities "as tolerated" and mentions issues with gastrointestinal problems.
>
> We do not have any medical documentation supporting gastrointestinal problems that would prevent you from performing the duties of any occupation based on your education, training and experiences. Your claim was reopened August 14, 2007

following the reassessment review after giving significant weight to the decision rendered by Social Security.

We obtained a copy of your Social Security file in August 2007. These records show that you were initially approved for Social Security disability benefits on January 23, 1997 with a primary diagnosis of malignant neoplasm of lymphoid and histiocytic tissue/Hodgkin's Disease. Your claim was re-evaluated by the Social Security Administration and on May 04, 2000 you were approved for ongoing disability with primary diagnosis of Somatoform disorders with a secondary diagnosis of history of neoplasm of lymphoid and histiocytic tissue/Hodgkin's Disease. The Social Security Administration also indicated they would periodically review your claim for ongoing disability. However, without an updated Social Security Administration authorization, we are unable to contact the Social Security Administration to determine if further evaluations have been done since 2000 as they indicated and, if so, the outcome of their review.

To date, we have not received medical documentation as to the current status of the condition(s) that prevent you from working. Nor have we received the means to obtain such information. . . . At this time we feel an independent medical examination is necessary.

. . . .

Please notify us no later than December 01, 2016 if you plan on attending the examination and, if so, your availability. If you do not comply with our request, we will be unable to evaluate your ongoing eligibility for benefits and your claim may be closed with no further benefits payable.

(*Id*., AR 386-87).

In a letter dated December 5, 2016, Himes responded that Provident only has a right under the plan to have him examined "while a claim is pending" and that his claim was not. (*Id*., AR 391, 394-96). In a letter dated December 13, 2016, Provident advised Himes that, "while a claim for ongoing benefits is being made, it continues to be pending." (*Id*., AR 398). Provident explained that, "[a]s medical conditions and treatment can change over time, we reserve the right to conduct updated evaluations as we see fit" and that "[t]his has always been our process and has not been waived since the onset of your claim." (*Id*.) Provident also explained that, following the

11

reassessment period, it agreed to give the SSA decision significant weight, but "[t]o do this, we need a completed written authorization to obtain a copy of their claim file[,]" which "allows us to review the documentation they used to arrive at their determination." (*Id*.) Provident warned that, if he refused to provide such authorization, it was "not required to apply the Social Security significant weight/compelling evidence analysis" in its ongoing evaluation. (*Id*.) Provident reiterated that, during an ongoing claim evaluation, it had the right to require an IME and that if Himes did not attend, his claim might close with no further benefits because it would not have any documentation of his current status. (*Id*., AR 398-99). In a December 29, 2016 letter, Himes repeated that Provident only had a right under the plan to have him examined "while a claim is pending," but that his claim was not. (*Id*., AR 402). Denying to furnish his authorization for Provident to request his updated SSA information, Himes stated that Provident was seeking SSA information that it already received in 2007. (*Id*., AR 403).

On February 15, 2017, Provident informed Himes that it had scheduled an IME with an occupational medicine specialist for March 21, 2017. (Doc. No. 24-8, AR 2626-27). However, Himes reiterated that he was not required to attend the examination. (*Id*., AR 2631). Provident responded in a letter dated March 6, 2017, stating, "The evaluation of your monthly request and eligibility for benefits under the Total Disability provisions of the policy is continuing and, thus, still pending," and therefore the "determination of disability is not limited to a one point in time analysis, as evidenced by the structure of the policy which provides monthly benefits for an ongoing 'period of disability'" (Doc. No. 24-12, AR 3650). Himes did not attend the IME, and, as a result, in a letter dated March 27, 2017, Provident informed Himes that it would not pay his benefits after March 21, 2017, because of his failure to attend the IME. (*Id*., AR 3471-74, 3492).

The letter notified Himes of his right to appeal the termination decision and that, upon his written request, Provident would provide him with all documents, records, and other information relevant to his claim for benefits. (*Id*., AR 3473-74). Himes subsequently filed a claim with the Tennessee Department of Commerce and Insurance (TDCI). (*Id*., AR 3495-98). On May 16, 2017, after Himes's request, Provident provided him a copy of his case file. (*Id*., AR 3697, 3699).

On May 26, 2017, Dr. Doss mailed Provident a letter on Himes's behalf, stating that Himes "continues to have multiple symptoms making him disabled, including profound gastrointestinal symptoms and severe odor sensitivity related to chemotherapy, that make him unable to work, and making him fully disabled in my opinion." (*Id*., AR 3702). On June 15, 2017, Provident acknowledged receipt of Dr. Doss's report, informed Himes that his claim remained closed and that it needed updated medical authorization forms to assist in its review, and advised him of his appeal rights. (*Id*., AR 3704-05). On June 19, 2017, Himes submitted his appeal, which was stamped "Received" on June 27, 2017. (Doc. Nos. 1, 21, at ¶ 45; Doc. No. 24-12, AR 3710). On July 18, 2017, Himes had a telephone conversation with a Provident lead appeals specialist named Melissa Walsh. (Doc. No. 24-13, AR 3910-11).   Himes told her that he did not have any additional records from Dr. Doss, that he had not seen the doctor in a while, and that he had asked Dr. Doss in May to write a letter. (*Id*., AR 3910). During the call, Walsh told him that she was calling to introduce herself and said that she had not reviewed his whole case. (*Id*., AR 3911). She also stated that the IME should have been scheduled with an oncologist rather than an occupational medicine specialist. (*Id*., AR 3911, 3921). In a follow-up letter, Walsh informed Himes that he had to undergo an IME to proceed with his appeal and that, without an IME, there was no way to reinstate his benefits. (*Id*., AR 3916). In an August 1, 2017 telephone call, Walsh corrected herself, stating

13

that the IME would be conducted by an occupational medicine specialist. (*Id.*, AR 3921). Walsh

explained to Himes that she "spoke to our doctor about this and he and our nurse said an occ med

is in the best position to comment on your conditions and functionality. Where your cancer is in

remission and has been for years, there is nothing for an oncologist to assess." (*Id.*) Himes agreed

to attend an IME because Provident could not assess his appeal without one. (*Id.*) In an August 8,

2017 letter, Provident referred Himes for an IME with an occupational medicine specialist named

Dr. Kent to be conducted on September 27, 2017. (*Id.*, AR 3931-32).

In an August 22, 2017 letter, Himes unsuccessfully objected that, based on his conversation

with Walsh, the IME should be performed by an oncologist. (Doc. No. 24-16, AR 4809). Himes

complained:

> I am specifically referring to your statement that an Independent Medical Exam
> scheduled by the Benefits Center in March of 2017 with an Occupational Medicine
> Specialist was inappropriate due to the fact that an oncologist would be more
> knowledgeable about my circumstances. You stated that an oncologist would be
> sought to perform my IME. However, you and your colleagues in the Appeals
> Division proceeded to do the exact same "inappropriate" thing by scheduling an
> IME with an Occupational Medicine Specialist for September 2017. Another
> concern of mine was your statement during our initial telephone conversation that
> you had not read my appeal even though Unum had received it at least one month
> prior. And during our last telephone conversation you could not confirm that
> Unum's physicians or the Director had read my entire appeal before reaching their
> conclusion that an IME was appropriate.

(*Id.*, AR 4809).

On August 29, 2017, Walsh responded, stating, in part:

> You brought up our initial telephone conversation and indicated I stated it was
> "inappropriate" for The Benefits Center to have an IME with an occupational
> medicine physician. First, I remind you that when we spoke I had yet to review
> your claim file. Second, I never indicated it was "inappropriate" for them to utilize
> an occupational medicine physician. I did question why they wanted you to be seen
> by an occupational medicine physician when your diagnosis was cancer. However,
> after reviewing your file in its entirety, it was clear that your cancer was in

remission and the symptoms you were claiming to be impairing were stomach issues and sensitivity to odors. Therefore, an occupational medicine physician is most appropriate to address these conditions.

You again raised concern that I could not tell you whether our physicians or my director reviewed your entire appeal before reaching their conclusion that an IME was necessary. This is inaccurate. Our physician and my director DID review your letter of appeal. While we recognize your concerns, you have not treated with a doctor in a number of years. Therefore, we have no medical data to evaluate in conjunction with your claim. While we have an updated narrative from Dr. Doss, he has not seen you in several years. Therefore, he is merely advising us what you have told him.

. . . .

I have reviewed your file in its entirety. I understand you report you are unable to work due to stomach issues and sensitivity to odors. However, there is no medical data in approximately 10 years to substantiate your reports. The mere fact you state you have these conditions [does] not entitle you to benefits. The company is well within their right to evaluate these symptoms by having you examined.

(*Id*., AR 4813-14). Following additional exchanges in September 2017, where Walsh advised

Himes that she had reviewed his file with the help of the appeals physician and nurse and that they

all believed that they did not have sufficient information to determine if he currently had

restrictions or limitations that would prevent him from engaging in "any gainful occupation,"

Himes confirmed his intention to attend the IME with the occupational medicine specialist because

he felt that he had no choice. (*Id*., AR 4841, 4825-33, 4835-36).

On November 2, 2017, Himes received a letter decision from Provident affirming the

decision to terminate his benefits. (*Id*., AR 4877-86). Summarizing the IME, the letter stated that

Dr. Kent "found [Himes's] physical limitations . . . minimal . . . [and] did not believe [Himes]

required any limitations secondary to [his] physical symptoms from [irritable bowel syndrome]

and strong sensitivities to smell." (*Id*., AR 4883). Accordingly, the results of the IME did

15

not support restrictions or limitations which would prevent [Himes] from performing the substantial and material duties of [his] occupation, or engaging in any occupation in which [he] might reasonably be expected to engage because of education, training or experience, with due regard to [his] vocation and earnings at the start of disability.

(*Id.*, AR 4878). The letter also stated that Himes was "not receiving appropriate care by a physician which is required by [the] policy." (*Id.*)

As to evidence from the SSA, the letter stated:

It is our company's process to give significant weight to the SSA's award of disability. During 1997 the company received a copy of their file. They approved benefits on January 23, 1997 with a primary diagnosis of malignant neoplasm of lymphoid and histiocytic tissue/Hodgkin's Disease. Your claim was re-evaluated by SSA. On May 4, 2000, you were approved for ongoing disability with a primary diagnosis of Somatoform disorders with a secondary diagnosis of history of neoplasm of lymphoid and histiocytic tissue/Hodgkin's Disease. The[y] indicated they would periodically review your claim for ongoing disability.

The company requested an updated authorization from you so they could request your SSA file after May 2000. You indicated nothing had changed in your condition, so you refused to complete the authorization. Mr. Himes, your statement is inconsistent [sic] the fact that after your claim was reevaluated in 2000, they change[d] your primary diagnosis to "Somatoform disorders" which is a behavioral health condition. Your secondary diagnosis was a "history" of neoplasm of lymphoid and histiocytic tissue/Hodgkin's Disease. They did not approve benefits based on conditions of IBS or sensitivity to odors which is what you have been reporting is your disabling conditions.

As you have not authorized us to obtain a copy of their updated file, we are unable to review their file in conjunction with our claims decision. While you have indicated nothing in your condition has changed, you have provided us with no documentation to support this, other than your word and other than medical records from over 21 years ago.

(*Id.*, AR 4883-84).

With respect to Himes's claim regarding the waiver, the letter stated that "it is the company who is to deem that no additional care would be of benefit to [Himes], not [Himes]," that "the company at no point in the claims handling advised you that they believed no additional care would

be of benefit to [Himes]", and that "[w]aiving an Attending Physician's Statement is NOT the same as waiving care by a physician." (*Id.*, AR 4884). The letter also discounted Himes's alleged belief that his medical records from 1994 to1996 clearly explained the status of his medical condition, stating that "[t]he approval of benefits for one period of time in no way guarantees or obligates the company to providing permanent benefits to the maximum benefit period." (*Id.*, AR 4884-85). As to Dr. Doss's May 17, 2017 opinion, the letter stated:

> However, his letter was based on your self-report as you have not seen him since 2005. There are no medical records or testing to corroborate his statements or your own. Again, we remind you that the policy requires proof of loss. Claims are not paid based on an insured merely stating they have a medical condition. Such condition(s) must be supported by medical data, including, but not limited to, medical records, office notes, diagnostic testing, etc. It is not clear how you could have such disabling IBS yet not see a doctor for more than a decade. Regardless, your policy requires ongoing appropriate care.

(*Id.*, AR 4885). Lastly, the letter stated that, based on Himes's "several reference[s] to the Regulatory Settlement Agreement", his "claim ha[d] been handled within the expectations of the RSA." (*Id.*) The letter concluded by requesting that Himes notify Provident within sixty days "[s]hould [he] undergo treatment with any additional physicians, for any conditions[.]" (*Id.*, AR 4886). If Provident did "not receive evidence of additional treatment . . . or hear from [Himes] by Friday January 5, 2018," Provident would consider the decision to terminate Himes's benefits final. (*Id.*)

On November 12, 2017, Himes wrote a lengthy letter challenging the Appeals decision. (*Id.*, AR 4897-4907). On November 28, 2017, Himes wrote another letter challenging Dr. Kent's IME report, stating that it relied on false information that Provident rejected. (*Id.*, AR 4913, 4916). Himes filed a formal complaint with Provident on December 14, 2017, stating that his claim and

17

appeal had been handled improperly and that the decision to terminate his benefits was based on false information. (*Id*., AR 4927-30). After Provident's response, Himes wrote again on January 11, 2018, objecting to Provident's decision. (*Id*., AR 4931-34, 4940-44). On February 4, 2018, Himes sent another letter (Doc. No. 24-17, AR 5048-50) to Providence regarding his complaint and stated, among other things, that Provident only had the right to be provided evidence of SSA benefits under the RSA, which he provided in 2007 for the reassessment, and that Provident was required to give significant weight to an award of SSA benefits under the RSA (*Id*., AR 5049). On March 1, 2018, Himes requested from Provident a copy of his complete disability file. (*Id*., AR 5052). On March 8, 2018, Provident provided Himes with the updated file from May 16, 2017 to March 8, 2018. (*Id*., AR 5055-58).

On September 17, 2018, Himes emailed Provident's Benefits Coordinator named Ms. Towle, citing that his LTD benefits were reinstated in 2007 pursuant to the RSA and requesting her comments regarding the administration of his policy. (*Id*., AR 5077-78). Walsh responded instead, stating that Himes had exhausted his appeals remedies and that his numerous complaints had been previously addressed; she also enclosed copies of their previous letters. (*Id*., AR 5079). On October 17, 2018, Himes emailed the Customer Relations Department, stating his intention to file suit in federal court, and included part of a draft of his federal complaint. (*Id*., AR5086-5107). Himes stated that his complaint documented Provident's violation of the provisions of the plan and the terms of the RSA and that Provident did not fairly and accurately administer his claim and appeals. (*Id*., AR 5086). On October 18, 2018, Provident responded, stating that he had exhausted his administrative remedies and referred him to its legal department. (*Id*., AR 5083).

18

## C.     Procedural History

On March 8, 2019, Himes filed this action pro se under 29 U.S.C. § 1132(a)(1)(B), seeking payment of benefits from the date they were terminated by Provident on March 22, 2017, and reinstatement of those benefits going forward. (Doc. No. 1). Provident filed a motion to dismiss under Rule 12(b)(6), arguing that Himes filed this action well after the three-year limitations period, set by the plan, had expired. (Doc. Nos. 10, 11). On March 3, 2020, the Court denied Provident's motion. (Doc. Nos. 16, 20). Provident subsequently filed its answer (Doc. No. 21), and the Court entered its Scheduling Order (Doc. No. 22). Himes has filed a motion to supplement the administrative record and a motion for judgment on the administrative record. (Doc. Nos. 25, 28).

In his motion to supplement the record, Himes asks the Court to include in the administrative record a complete copy of the RSA, an August 26, 2019 SSA review letter regarding his SSDI claim, an October 22, 2007 letter written by Himes to Provident, and a May 21, 2017 letter written by Himes to Dr. Doss asking him to confirm to Provident that Himes was still experiencing the same health issues as he had when he was treated by Dr. Doss.   Himes argued that such documents would address bias and procedural defects in Provident's claims and appellate reviews. (Doc. No. 25).   In response, Provident objects to the inclusion of these documents, arguing that these documents do not address either of his bias or procedural defect allegations, particularly given that Himes had ample opportunities to include these items in the record (with the exception of the August 2019 letter) prior to filing suit. (Doc. No. 26). Moreover, Provident argues that (1) Provident has no record of receiving the October 22, 2007 letter and there is no reference to the letter anywhere in the administrative record; (2) the August 2019 SSA notification and the May 2017 letter to Dr. Doss were never submitted to or requested by Provident; (3) the

19

August 2019 SSA notification was not even created until after Himes filed his federal action; and (4) Himes included portions of the RSA he deemed pertinent to his benefits claim, but he chose not to submit the entirety of the RSA to Provident. (*Id.*) In his reply, Himes cites the difficulty in examining the administrative record, which is thousands of pages long, not in chronological order, and includes many duplicate pages, arguing that the requested documents do address his bias and procedural defects allegations. (Doc. No. 27).

In his motion for judgment on the administrative record, Himes sets forth thirteen statements of error that the Court will address *seriatim*.

## II.     Standard of Review

ERISA establishes a "uniform regulatory regime over employee benefit plans" in order to "protect beneficiaries of [those] plans while providing employers with uniform national standards for plan administration." *Milby v. MCMC LLC*, 844 F.3d 605, 609 (6th Cir. 2016) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004)). To that end, ERISA requires plans to "provide certain presuit procedures for reviewing claims after participants submit proof of loss (internal review)." *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 105 (2013) (citing 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1 (2012)). When the internal review has been exhausted, a beneficiary can bring an action in federal court under 29 U.S.C. § 1132(a)(1)(B) to recover benefits owed under the plan.[5] *Id.* at 102 (citing 29 U.S.C. § 1132(a)(1)(B)). However, "ERISA does not

---

[5]     In the ERISA context, exhaustion of internal review is not a jurisdictional requirement; rather, it is an affirmative defense that can be waived by the defendant. *Patterson v. Chrysler Grp., LLC*, 845 F.3d 756, 763 n.7 (6th Cir. 2017) (holding that exhaustion of administrative remedies in ERISA case was "not at issue because . . . Defendants . . . did not pursue the issue in the district court and therefore waived it").

set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). In *Bruch*, the Supreme Court held that the applicable standard will depend on the terms of the relevant benefit plan: "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan[,]" a challenge to a denial of benefits under § 1132(a)(1)(B) will "be reviewed under a de novo standard[.]" *Id.* at 115. "When the plan vests the administrator with discretion to interpret the plan . . ., the court reviews the benefits denial under the 'arbitrary and capricious' standard." *Corey v. Sedgwick Claims Mgmt. Servs., Inc.*, 858 F.3d 1024, 1027 (6th Cir. 2017). Here, Provident agrees that a de novo standard of review is appropriate in determining whether it properly interpreted the plan and if Himes is entitled to LTD benefits under the plan (Doc. No. 30, PageID# 5741, 5761).[6] Therefore, the Court will apply that standard. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 n.3 (6th Cir. 1998) (applying de novo review where parties did not contest district court's finding that de novo review was appropriate); *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 842 (7th Cir. 2009) (declining to "look behind" parties' agreement that de novo standard applied to review of plaintiff's denial-of-benefits claim).

---

[6] Provident asserts that, while the de novo standard is the proper standard of review as it relates to LTD benefits under the wording of the plan, under Sixth Circuit law, the arbitrary and capricious standard applies to the plan's language pertaining to the waiver of premiums, which states that the claimant "must give [Provident] satisfactory proof of disability" "[f]or premiums to be waived." (Doc. No. 30, PageID# 5741-42, 5761). *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555-58 (6th Cir. 1998)   *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996); *Neaton v. Hartford Life & Acc. Ins. Co.*, 517 F. App'x 475, 481 (6th Cir. 2013). This issue, however, is not before the Court, as it was not raised in Himes's complaint, and will therefore not be addressed.

In applying the de novo standard of review in an ERISA action, the court's role in reviewing the denial of benefits is to determine if the plan administrator made the correct decision. *Hoover v. Provident Life & Acc. Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002). "The administrator's decision is accorded no deference or presumption of correctness. The review is limited to the record before the administrator and the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Id*. at 809 (citation omitted). The "de novo standard of review applies to the factual determinations as well as to the legal conclusions of the plan administrator." *Wilkins*, 150 F.3d at 613 (citing *Rowan v. Unum Life Ins. Co.*, 119 F.3d 433, 435 (6th Cir.1997)). To succeed on his claim for disability benefits under ERISA, the plaintiff bears the burden of proving by a preponderance of the evidence that he was "disabled," as that term is defined in the plan. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Employees*, 741 F.3d 686, 700-01 (6th Cir. 2014) (citing *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 516 n.4 (6th Cir. 2006)). "A court does not have to address a defendant's potential conflict of interest in determining eligibility for benefits when the review is de novo." *Smith v. Metro. Life Ins. Co.*, 260 F. Supp. 3d 888, 893 (E.D. Mich. 2017) (citing *Conway v. Reliance Std. Life Ins. Co.*, 34 F. Supp.3d 727, 730 (E.D. Mich. 2014)); *Mulligan v. Provident Life & Accident Ins. Co.*, 271 F.R.D. 584, 588 n.5 (E.D. Tenn. 2011) ("An administrator's conflict of interest is relevant only if the administrator's decision is to be reviewed under the arbitrary and capricious standard of review.").

In ERISA actions, a motion for judgment on the administrative record is the appropriate procedural method for judicial review. *Wilkins*, 150 F.3d at 619.

### III.    Analysis

#### A.    Motion to Supplement the Record

"Although the Supreme Court did not discuss the meaning of *de novo* review in *Bruch*," the Sixth Circuit held in *Perry v. Simplicity Engineering* that the term contemplates district court review of "the administrator's decision . . . without deference to the decision or any presumption of correctness[ ] *based on the record before the administrator*." *Perry v. Simplicity Eng'g, a Div. of Lukens Gen. Indus., Inc.*, 900 F.2d 963, 966 (6th Cir. 1990) (second emphasis added). The *Perry* court explicitly rejected an interpretation of de novo review that would allow consideration of evidence outside the administrative record:

> In the ERISA context, the role of the reviewing federal court is to determine whether the administrator or fiduciary made a correct decision, applying a *de novo* standard. Nothing in the legislative history suggests that Congress intended that federal district courts would function as substitute plan administrators, a role they would inevitably assume if they received and considered evidence not presented to administrators concerning an employee's entitlement to benefits. Such a procedure would frustrate the goal of prompt resolution of claims by the fiduciary under the ERISA scheme.

In *Wilkins v. Baptist Healthcare System, Inc.*, the Sixth Circuit reaffirmed that, "[w]hen conducting a de novo review, the district court must take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator." 150 F.3d at 616. However, the Sixth Circuit also created an exception to that rule, directing district courts to adopt a two-step approach in adjudicating ERISA denial-of-benefits claims:

> 1.    As to the merits of the action, the district court should conduct a *de novo* review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly. The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in

the administrative record, but may not admit or consider any evidence not presented to the administrator.

2.　　The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part. This also means that any prehearing discovery at the district court level should be limited to such procedural challenges.

*Id*. at 619 (Gilman, J., concurring).[7]

### 1.　　RSA Documents

"In conducting its *de novo* review, a district court may only consider evidence that was first presented to the administrator." *Id*. at 618. "The administrative record in an ERISA case includes all documentation submitted during the administrative appeals process because this information was necessarily considered by the plan administrator in evaluating the merits of the claimant's appeal." *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Bos.*, 419 F.3d 501, 511 (6th Cir. 2005). To provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination, the claims procedures of a plan shall provide a claimant (1) at least 60 days after notification of an adverse benefit determination within which to file an administrative appeal; (2) the opportunity to submit written comments, documents, records, and other information

---

[7]　　Judge Gilman's concurring opinion constituted the opinion of the court regarding the procedures to be used in adjudicating an ERISA denial-of-benefits claim. *Wilkins*, 150 F.3d at 611; *see also Bell v. Ameritech Sickness & Accident Disability Benefit Plan*, 399 F. App'x 991, 997 n.4 (6th Cir. 2010) ("Although Judge Gilman's opinion in *Wilkins* was nominally a concurrence, he wrote for the majority on this issue.").

24

relating to the claim for benefits; (3) the right to be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits; and (4) a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination. 29 C.F.R. § 2560.503-1(h)(2)(i)-(iv). "A claimant's failure to fully explore and exercise her procedural rights does not undermine the fundamental fairness of an otherwise full and fair administrative review process." *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 502 (6th Cir. 2010).

Himes asks the Court to include in the administrative record for the court's consideration portions of the RSA that are attached to his memorandum as an exhibit. (Doc. No. 25-1). However, thirteen of these pages (Doc. No. 25-1, at PageID# 5542-54) were previously included in the administrative record (Doc. No. 24-12, AR 3786-98). As to the other pages, the record reflects that Provident informed Himes several times of his right to request and submit whatever information he wanted it to consider when considering his appeal. In fact, in May 2017, Himes requested and received a copy of his claim file, which allowed him the opportunity to see the contents of the file and supplement it through the appeal process. Instead of submitting the entire copy of the RSA, Himes chose to submit only those portions that he deemed were relevant. Himes does not allege that he requested and was denied a copy of the entire RSA. Thus, to the extent evidence is missing from the administrative record, Himes is to blame, and he "cannot now seek to make a complete evidentiary record, having failed to do so during his administrative appeal." *Fendler v. CNA Grp. Life Assur. Co*, 247 F. App'x 754, 758 (6th Cir. 2007); *see also Carlson v. Reliance Standard Life Ins. Co.*, No. 3:15-CV-0200, 2017 WL 4767660, at *11 (M.D. Tenn. Oct. 20, 2017), *report and*

*recommendation adopted*, No. 3:15-CV-00200, 2018 WL 508070 (M.D. Tenn. Jan. 23, 2018) ("If a claimant had the opportunity to submit additional evidence, but chose not to do so, it is improper for the court to allow supplementation of the administrative record." (citing *Fendler*, 247 F. App'x at 758)).

Himes argues that he did not initially submit portions of the RSA pertaining to IMEs for his administrative appeal in June 2017 because at that point those portions were not relevant; they became so when Provident forced him to attend an IME following his appeal. (Doc. No. 25, PageID# 5525; Doc. No. 27, PageID# 5635-36). Himes asserts that Provident's March 2017 termination letter stated that he could either attend an IME to provide Provident with additional information or he could file an administrative appeal, but that Provident later forced him to attend an IME by stating that it would not complete his appeal unless he agreed to attend an IME. (Doc. No. 25, PageID# 5524-25). Himes argues that these portions of the RSA are relevant because they give specific guidelines as to when an IME can be requested. (*Id*. at PageID# 5525).

However, Himes was aware of the issue prior to his June 2017 appeal and had ample opportunity to submit any relevant portions of the RSA pertaining to IMEs after he filed his appeal. In November 2016, Provident informed Himes of the need to attend an IME. (Doc. No. 24-1, AR 387). Provident informed him in December 2016 of its right to require an IME and that, if he did not attend, his claim might close with no further benefits because of the lack of any documentation of his current status. (*Id*., AR 398-99). On March 27, 2017, Provident informed Himes that it was terminating payment of his LTD benefits because of his failure to attend the IME. (Doc. No. 24-12, AR 3472). In July 2017, Walsh informed Himes that he must attend an IME in order to proceed with his appeal and for his benefits to be reinstated. (Doc. No. 24-13, AR 3916). In its November

2, 2017 appeals decision, Provident informed Himes that, if it did not receive additional evidence of treatment or hear from him by January 5, 2018, its decision would be final. (Doc. No. 24-16, AR 4886). Himes subsequently wrote directly to Provident on November 12, 2017, November 28, 2017, December 14, 2017, January 11, 2018, February 4, 2018, September 17, 2018, and October 17, 2018. (Doc. No. 24-16, AR 4897-4907, 4913, 4927-30, 4940-44; Doc. No. 24-17, AR 5048-50, 5077-78, 5086-5107).   Himes referenced the RSA in three of the writings (February 4, 2018, Doc. No. 24-17, AR 5049; September 17, 2018, *id*., AR 5077-78; and October 17, 2018, *id*., AR 5086, 5092). Himes did not include any additional excerpts from the RSA or the RSA in its entirety with any of his writings. Further, in March 2018, Himes requested and received from Provident an updated copy of his complete disability file. (Doc. No. 24-17, AR 5052, 5055-58). Thus, based upon the factual record, Himes had multiple opportunities to submit or supplement the record with the entire RSA or those portions that he believed relevant to the IME requirement, and, by failing to do so, he is barred from trying to supplement the administrative record at this juncture. *Fendler*, 247 F. App'x at 758.[8]

---

[8]     Even if the Court were to allow those portions of the RSA to be included, the Court fails to see how they would be helpful to Himes's claim as to when an IME can be requested, as the provisions are not inconsistent with the plan. The plan provides: "We, at our expense, have the right to have you examined as often as is reasonable while a claim is pending." (Doc. No. 24, AR 15). The portion of the RSA that Himes seeks to have included provides, in part: "B. An IME . . . should be sought whenever any of the following occurs unless the decision is made to pay or continue to pay the claim: . . . 2. A Company medical professional or other Company resource, e.g.,legal/compliance, Benefit Specialist responsible for the claim, states that an IME is needed." (Doc. No. 25-1, PageID# 5535).

## 2. August 2019 SSA Review Letter

Himes asks the Court to include the August 26, 2019 SSA review letter (Doc. No. 25-1, PageID# 5555) in the administrative record to show procedural error and bias. (Doc. No. 25, PageID# 5526). However, Himes received this letter well after the administrative record closed and after he filed this federal action. "The Sixth Circuit has explained that 'such evidence does not fall under the exception to the rule that federal courts can only consider evidence properly presented to the plan administrator when reviewing the reasonableness of an ERISA determination.'" *Blajei v. Sedgwick Claims Mgmt. Servs., Inc.*, 721 F. Supp. 2d 584, 599 n.6 (E.D. Mich. 2010) (citing *Storms v. Aetna Life Ins. Co.*, 156 F. App'x 756, 760 (6th Cir.2005) (where the Court affirmed district court's decision to preclude plaintiff from supplementing the administrative record "with documents demonstrating that [plaintiff] was awarded Social Security benefits [ ] after the closure of the administrative record.")). Further, Provident was aware that Himes was awarded SSDI benefits in 1997, and, during the reassessment process in 2007, Provident requested his SSA file from the SSA, received it, and included it in the administrative record. (Doc. No. 24-1, AR 386-87, 415; Doc. No. 24-5, AR 1574-75; Doc. No. 24-3, AR 913; Doc. No. 24-12, AR 3495, 3576-81). The fact that Himes was awarded SSDI benefits was considered by Provident. (Doc. No. 24-16, AR 4883). Moreover, in October and December 2016, Himes refused Provident's request for an updated authorization that would have allowed it to obtain his updated SSA file. (Doc. No. 24-1, AR 381, 386-87, 395). Accordingly, Himes has failed to demonstrate that the inclusion of this document supports his allegations of bias or procedural deficiencies.

### 3.    Himes's October 2007 Letter to Provident

Himes next asks the Court to include an October 22, 2007 letter he purportedly sent to Provident, where he objected to Provident's decision to reduce the frequency of the APS to bi-annually and reiterated that he expected Provident to honor the plan's waiver provision. (Doc. No. 25-1, PageID# 5560). Provident asserts that it has reviewed the record and its internal file, and there is no evidence that it received this letter. (Doc. No. 26, PageID# 5572). The letter is unsigned, and Himes did not include any evidence of mailing or emailing it. Himes sent Provident a letter dated September 21, 2007, asserting that he had met the plan's waiver provision and expected Provident to waive the annual APS requirement, which letter is in the administrative record. (Doc. No. 24-5, AR 1528-29). Himes admits that the October 22, 2007 letter contains information almost identical to that in his September 21, 2007 letter. (Doc. No. 25, PageID# 5527). This October letter is cumulative, as the administrative record is replete with Himes's assertion that he believed that he met the waiver provision and that he objected to submitting an APS. There is no evidence that he submitted it to Provident, and it does not address any alleged bias or procedural errors. Accordingly, the Court finds this letter should be excluded from the administrative record.

### 4.    Himes's May 21, 2017 Letter to Dr. Doss

Last, Himes asks the Court to include in the administrative record his May 21, 2017 letter to Dr. Doss, asking Dr. Doss to send Provident a letter confirming his disability. (Doc. No. 25, PageID# 5528; Doc. No. 25-1, PageID# 5561). Himes admits that he did not provide the letter to Provident because he had no reason to do so, but he now seeks to include it for "context." (Doc. No. 25, PageID# 5528). The court is at a loss as to the relevance of the letter. In any event, Himes had the opportunity to submit the letter during the appeals process but chose not to do so. The letter

29

does not address any alleged bias or procedural irregularities and, therefore, there is no basis for including it in the administrative record.

**B.     Statements of Error**

**1.     Provident's 2007 Relaxation of the Frequency of the APS Requirement and Refusal to Waive Physician Care**

Himes asserts that, in response to his 2007 request for Provident to waive the requirement for physician care, Provident instead, contrary to the plan, relaxed the time period stated in the plan for him to provide proof of loss. (Doc. No. 29, PageID# 5650).   As a result, Himes asserts that Provident violated its fiduciary duty under 29 U.S.C. § 1104(a)(1).

The Sixth Circuit has explained that ERISA distinguishes between welfare benefit plans and pension plans, stating that "one of the key differences between welfare and pension plans is that welfare plan benefits do not vest." *Gregg v. Transportation Workers of Am. Int'l*, 343 F.3d 833, 844 (6th Cir. 2003). As a result, "plan administrators may modify a welfare plan's terms at any time, whether or not the employer or union reserved the right to do so." *Id*. Therefore, "fiduciary duties do not apply to the amendment or termination of an unfunded, contingent benefit plan." *Id*.; *Brubaker v. Block Commc'ns, Inc.*, No. 306 CV 7005, 2007 WL 489570, at *2 (N.D. Ohio Feb. 9, 2007) ("Employers are generally free under ERISA to adopt, modify, or terminate welfare plans for any reason at any time.").

Provident notified Himes on September 14, 2007 that his claim was being handled through the Extended Duration Unit, and, consequently, he would no longer be required to send monthly forms.   Instead, he would only need to submit his supplemental statement and authorizations on a semi-annual basis and an updated APS on an annual basis. (Doc. No. 24-12, AR 3582-83). After

30

Himes's objection and his request that Provident waive the annual APS requirement because it had been more than ten years since he had developed disabling health problems that prevented him from being able to return to work, Provident, on October 11, 2007, informed him that it could not "completely waive the required [APS]," but that it would "reduce the frequency to bi-annually." (Doc. No. 24-5, AR 1527-29). Provident's actions do not constitute breaches of fiduciary duty under ERISA, given that a pension plan was not involved. Further, Himes was not harmed by these actions, as he continued to receive benefits under the plan through March 21, 2017. Accordingly, this statement of error is without merit.

### 2. Provident's 2012 Continued Relaxation of the APS Requirement and Its Refusal to Waive the Physician Care Requirement

Himes asserts that, in April 2012, he again requested that Provident waive the plan's physician care requirement but that Provident, instead, improperly waived the periodic requirement for a completed APS and only required him to submit the Claimant's Statement and Authorization portions of the Individual Disability Status Update once a year. (Doc. No. 29, PageID# 5651; Doc. No. 24-1, 85-86, 109). Himes argues that Provident also improperly reserved the right to require an APS at a later date, if deemed necessary. (*Id*.) Himes asserts that, by not following the plan's provisions, Provident breached its fiduciary duty.

In making the modifications, Provident specifically included the following caveat: "In relaxing the policy requirements regarding the periodic completion of the Attending Physician Statement, we are not waiving any of our rights under the policy, including the right to require completion of an Attending Physician Statement at a later date, if deemed necessary." (Doc. No. 24-1, AR 109). The relaxation of the requirement for continued physician care for purposes of meeting the definition of total disability was made with a full reservation of rights. Therefore,

Himes benefitted from Provident's relaxing the policy requirements regarding the periodic completion of the APS, and he fails to show that these actions were harmful or constitute a breach of fiduciary duties.

### 3. Provident's Request for an APS and Updated Medical Information and Its Refusal to Waive the Physician Care Requirement Following the Change in Definition for Total Disability

Himes argues that Provident refused to follow the plan provision that waived physician care, when continued care was of no benefit, and it continued to refuse to implement the waiver in 2016 and 2017 in violation of its fiduciary duties. (Doc. No. 29, PageID# 5653). In essence, Himes argues that the decision to terminate his benefits was improper because he had been receiving benefits for ten years consecutively, and there was no evidence of a change in his condition that would have justified a termination of benefits.

Based upon the terms of the plan, the definition of total disability changed when Himes turned fifty-five, stating that Himes would be considered totally disabled if he were unable "to engage in any gainful occupation in which [he] might reasonably be expected to engage because of education, training, or experience," and he was "*receiving care by a physician which is appropriate for the condition causing the disability.*" (Doc. No. 24, AR 8 (emphasis added)). The plan provides for benefits to be paid monthly and for the claimant to continue to give written proof of loss. (*Id.*, AR 10, 14-15). However, the record shows that Himes had not seen a physician regarding his condition causing his disability since he saw Dr. Doss in May 2005. (Doc. No. 24-1, AR 66; Doc. No. 24-16, AR 4885). In order to assess Himes under the new definition for total disability, it therefore needed updated medical information as allowed by the plan.

32

In *Bruton v. Am. United Life Ins. Corp.*, 798 F. App'x 894 (6th Cir. 2020), the Sixth Circuit addressed a similar provision in an ERISA plan that provided that a person was totally disabled if, because of injury or sickness, the person could not perform the material and substantial duties of his regular occupation; was not working in any occupation; after the monthly benefit had been paid for the number of years stated in the agreement, a person could not perform the duties of any gainful occupation for which he was reasonably fitted by training, education, or experience; and a person was under the regular attendance of a physician for that injury or sickness. *Id*. at 895-96. The Sixth Circuit noted that "[m]any courts have concluded that a benefits plan clause that obligates a claimant to be under the 'regular care' or in 'regular attendance' of a physician . . . exists merely to prevent malingering and fraud." *Id*. at 902. The Court favorably noted that "[s]ome courts . . . have concluded that when a 'regular attendance' requirement specifies that a claimant must receive treatment 'appropriate for the condition causing the disability,' it implies an affirmative duty on the part of the insured to seek and accept care designed to enable the insured to return to his former employment." *Id*. (emphasis omitted).

Moreover, in *Rose v. Hartford Fin. Servs. Grp., Inc.*, 268 F. App'x 444 (6th Cir. 2008), the Sixth Circuit addressed an argument similar to the one made by Himes in this action. There, the plaintiff argued that the insurer's decision to terminate her benefits was unreasonable, given that she had been receiving benefits for eleven years and there was no evidence of a change in her condition that would have prompted a termination of benefits. *Id*. at 454. The Sixth Circuit rejected this argument, finding that the plaintiff did not have a "right to receive long-term benefits indefinitely" after the insurer's initial determination that she was entitled to benefits. *Id*. The Court noted that "it would be illogical to prohibit an insurer from ever revisiting an insured's claim,

33

particularly in light of newly discovered evidence calling into doubt an insured's disability." *Id.* (citing *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 274 (5th Cir. 2004)).

Here, the Court concludes that under the plan's terms Himes had a continuing obligation to provide medical evidence in support of his claim for disability benefits, particularly when the standard for determining total disability changed after his fifty-fifth birthday to an "any gainful occupation" standard. Himes's contention, therefore, is without merit.

### 4. Provident's Request for an IME

Himes asserts that Provident, questioning his subjective disabling conditions, improperly requested an IME, despite the disability policy "not requiring objective evidence to confirm disability, and despite the 2004 Regulatory Settlement Agreement prohibiting [Provident] from requiring objective evidence because that is not in the policy forms," in violation of its fiduciary duties. (Doc. No. 29, PageID# 5653, 5655).

Based upon the definition of total disability changing when Himes turned fifty-five, on August 12, 2016, Provident asked Himes to submit an APS, as all future reviews would be under the "any gainful occupation" standard of total disability. (Doc. No. 24-1, AR 306-07, 313; Doc. No. 24, AR 8). Himes objected, and, in additional communications, Provident repeated its request, but Himes steadfastly refused to provide an APS or an SSA authorization form. (Doc. No. 24-1, AR 338, 370, 374-76, 380-83). In its November 21, 2016 letter, Provident informed Himes that, because it had not received medical documentation as to the current status of the condition(s) that prevented him from working or the means to obtain such information, it believed that an independent medical examination was necessary. (*Id.*, AR 386-87). The plan specifically provides that Provident has the right to have a claimant examined as often as reasonable while a claim is

34

pending. (Doc. No. 24, AR 15). Given Himes's refusal to provide any updated medical proof of loss, as required under the terms of the plan, Provident did not breach its fiduciary duty under the plan. The plan provides that Provident may waive the physician care requirement, but the decision to do so is Provident's to make, not Himes's. Provident needed updated medical information following the change to the "any gainful occupation" standard to make such a determination. Further, the RSA's "Guiding Principles", under the title "Improved Procedures for Evaluating Multiple Conditions or Co-Morbid Conditions", provides that "Benefit Center professionals will evaluate all data available regarding a claim–Both objective and subjective [and] Both supporting impairment and supporting capacity." (Doc. No. 24-12, AR 3786, 3787). Here, Provident was seeking updated evidence from Himes so that it could assess the medical proof in connection with the new definition for total disability.

Himes's reliance on *Khan v. Provident Life and Accident*, 386 F. Supp. 3d 251 (W.D.N.Y. 2019) is misplaced, as it is factually distinguishable from this case. In *Khan*, the claimant established that he was entitled to benefits under his employer-sponsored individual disability insurance policy's "own occupation" standard, as well as the "any occupation standard", even though his claim was based on self-reported or subjective symptoms and limitations. *Id*. at 269-70, 276-80. The district court found that the policy did not require objective proof; the defendant chose not to conduct an in-person medical examination and the defendant and its medical consultants arbitrarily ignored the claimant's subjective complaints based on lack of laboratory data and objective clinical findings; claimant was awarded SSSDI benefits; and examining physicians unanimously agreed that he suffered from medically determinable impairments that could reasonably be expected to produce the pain and fatigue alleged and that would adversely

affect his ability to perform the duties of his job. *Id*. However, unlike here, the plaintiff timely provided defendant with access to all his medical records and authorized the defendant to obtain his SSA file. *Id*. at 260-61, 265-66. The defendant also deliberately did not seek an IME from the plaintiff during the claims or appeals process. *Id*. at 279-80. Given the change to the "any gainful occupation" standard, that Himes had not seen Dr. Doss or any physician providing care which is appropriate for the condition causing the disability since 2005, and that Himes repeatedly refused to provide updated medical information and SSA records, the Court concludes that Provident's request for an IME was reasonable and did not violate any fiduciary duty. *Guest-Marcotte v. Life Ins. Co. of N. Am.*, 730 F. App'x 292, 302 (6th Cir. 2018) ("While it is true that 'there is nothing inherently objectionable about a file review by a qualified physician,' we have repeatedly cautioned that plan administrators should not make 'credibility determinations concerning the patient's subjective complaints without the benefit of a physical examination.'" (citations and internal quotation marks omitted)).

### 5. Providing Significant Weight to the SSA's Decision Under the RSA

Himes argues that Provident violated the RSA because it does not allow Provident to request further evidence of proof of loss, and the RSA provides that Provident is to give significant weight to an award of Social Security Disability benefits. (Doc. No. 29, PageID# 5655-56). While it is true that the RSA provides that "Companies must give significant weight to evidence of an award of Social Security disability benefits as supporting a finding of disability," the RSA also provides the caveat: "unless the Companies have compelling evidence that the decision of the [SSA] was (i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable medical evidence, or (iii) inconsistent with the definition of disability contained in the

36

applicable insurance policy." (Doc. No. 24-12, AR 3790). Here, the definition of total disability changed when Himes turned fifty-five. Neither the RSA nor the plan prohibited Provident from reassessing Himes's LTD claim under these circumstances. To reassess Himes's claim, Provident needed updated medical information and SSDI information, which Himes refused to supply. Further, while significant weight is to be given to an award of SSDI benefits, that does not mean such weight is absolutely determinative, as it cannot be "inconsistent with the applicable medical evidence, or inconsistent with the definition of disability contained in the applicable insurance policy."[9] Accordingly, this contention is without merit.

### 6. Dr. Doss's May 26, 2017 Letter

Himes contends that Provident improperly rejected Dr. Doss's May 26, 2017 letter, where he opined that Himes was disabled and unable to work due to his gastrointestinal symptoms and severe odor sensitivity related to chemotherapy. (Doc. No. 29, PageID# 5656-57).

A treating physician does not have to be afforded special deference by an ERISA plan administrator. *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 262 (6th Cir. 2006). "[T]he assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the

---

[9]     As a general rule, "an ERISA plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan." *Whitaker v. Hartford Life & Acc. Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005). Also, statutes and regulations "that spell out what evidence to consider, how to decide the relative weight and credibility to accord each medical opinion, how to factor in the effect that the claimant's age may have on his ability to work, etc."do not apply to employee benefit plans. *Creech v. UNUM Life Ins. Co. of N. Am.*, 162 F. App'x 445, 454 (6th Cir. 2006).

treating physician lacks." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 123 S. Ct. 1965, 1971, 155 L. Ed. 2d 1034 (2003). The record reflects that Dr. Doss did not examine Himes prior to writing the letter, that Dr. Doss merely restated what Himes told him, and that Dr. Doss had not examined or treated Himes as a patient since 2005. Moreover, despite the lack of examination or treatment, in 2009, Dr. Doss signed an APS stating that Plaintiff could engage in activity "as tolerated." (Doc. No. 24-1, AR 62). As such, the Court concludes that Provident did not act inappropriately by disregarding Dr. Doss's May 2017 opinion letter and requesting Himes to attend an IME, as Himes failed to submit updated medical information so that it could adequately assess proof of loss.

### 7.     Failure to Read Himes's Claim File or Appeal

Himes argues that Provident did not engage in a full and fair review because the individual handling the appellate review admitted in a July 18, 2017 telephone call that she had not read his file on appeal. (Doc. No. 29, PageID# 5657-58). Himes also argues that Provident incorrectly stated, in a letter dated August 29, 2017, that he originally received benefits due to a cancer diagnosis instead of due to the cancer treatments. (*Id*., AR 5657). Himes asserts that, because Provident did not read his "claim file or appeal from the outset of the administrative appeal, [he] did not receive a full and fair review" by Provident. (*Id*., AR 5658).

To provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination, the claims procedures of a plan shall provide a claimant a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination. 29 C.F.R. § 2560.503-1(h)(2)(iv). Here, the

record shows that Himes submitted his appeal on June 19, 2017, and it was stamped "Received" on June 27, 2017. (Doc. No. 24-12, AR 3710). In memorializing the July 18, 2017 call, Walsh noted that Himes told her that he did not have any additional records from Dr. Doss, that he had not seen the doctor in a while, and that he had asked Dr. Doss in May to write a letter. (Doc. No. 24-13, AR 3910). Walsh also noted the following:

> I said that his policy requires him to be under the care of a physician and only we have the right to waive that if we believe no additional care would be beneficial. He thinks we did that in 2012. I said I hadn't reviewed the whole case. *I was merely calling to introduce myself and ask about the records from Doss as we were still following up with them.*

(*Id*., AR 3911) (emphasis added).

Subsequent to that call, in August and September 2017, Walsh informed Himes that she had read his appeal in its entirety, the appeals physician and nurse and Walsh's director had also reviewed his appeal, and all believed that an IME was needed because they lacked sufficient information to determine if he currently had restrictions or limitations that would prevent him from engaging in "any gainful occupation." (Doc. No. 24-16, AR 4813-14, 4835-36). Provident also had requested an IME from Himes beginning in November 2016, given the lack of updated medical information. (Doc. No. 24-1, AR 386-87).

As to the allegation concerning the misstatement in the August 29, 2017 letter regarding the basis of his disability, the record reflects that this misstatement did not exhibit a lack of a fair review, as Himes's condition has been described as non-Hodgkin's lymphoma at various times, including by Himes's oncologist, Dr. Magee, on July 8, 1996, (Doc. No. 24-4, AR 1251), the SSA, (Doc. No. 24-1, AR 415), and on his physician's 2012 form, (Doc. No. 24-1, AR 133-36). Moreover, in Walsh's August 29, 2017 letter, she specifically stated that, "after reviewing your file

in its entirety, it was clear that your cancer was in remission and the symptoms you were claiming to be impairing were stomach issues and sensitivity to odors." (Doc. No. 24-16, AR 4813-14). The November 2, 2017 appeals decision also addressed Himes's alleged limitations related to IBS and strong sensitivities to odors. (*Id*., AR 4883-84). Thus, the Court finds these allegations of the lack of a full and fair review to be without merit.

8. **The IME Process and Conclusions**

a. **IME Performed by an Occupational Medicine Specialist**

Himes argues that he did not agree with the type of physician chosen to conduct the IME and that Provident violated 29 C.F.R. § 2560.503-1(h)(3)(iii), as it should have chosen an oncologist as the appropriate professional to perform the IME. (Doc. No. 29, PageID# 5658). That regulation provides:

> The claims procedures of a group health plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless . . . the claims procedures--
>
> (iii) Provide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment[.]

29 C.F.R. § 2560.503-1(h)(3)(iii).

Although Himes preferred an oncologist to examine him, the record showed that his cancer had been in remission since 1996 and that Dr. Doss had not seen him since 2005. (Doc. No. 24-4, AR 1249; Doc. No. 24-1, AR 66, 133,415, 386-87). Walsh informed him that, after reviewing his entire file, the record showed that his cancer was in remission and the symptoms he was claiming to be impairing were stomach issues and sensitivity to odors, and, therefore, an occupational medicine physician was the most appropriate to address these conditions. (Doc. No. 24-16, AR

40

4813-14). No medical professional opined that an occupational medicine specialist conducting the IME was inappropriate. Accordingly, the Court concludes that Provident did not act inappropriately in relying on an occupational medicine physician to conduct the IME. *See Pestell v. Life Ins. Co. of N. Am.*, No. 3:06-0682, 2008 WL 11395466, at *16 (M.D. Tenn. Mar. 24, 2008) (defendant acted appropriately in choosing an occupational medicine physician to conduct an IME, as defendant was focused on determining the plaintiff's occupational restrictions and limitations, not whether he had Reiter's syndrome or another arthritic disease).

### b.      False Information

Himes next takes issue with the fact that in a few instances Provident stated that he did not report odor sensitivity until 2003 when, in fact, he first reported odor sensitivity in 1996. Himes asserts that Provident provided the same false information to Dr. Kent when he was conducting his IME, thereby depriving Himes of a full and fair review. (Doc. No. 29, PageID# 5659). Himes cites to a summary by Dr. Nancy Beecher in July 2003, where she falsely stated that records did not mention any problems with sensitivity to odors until March 1999, four years after completion of his chemotherapy, (Doc. No. 24-12, AR 3564; Doc. No. 24-13, AR 3868)., and to an August 28, 2003 letter, where Provident apologized for the incorrect statement and stated that, after Dr. Beecher re-reviewed the file, she correctly noted that he did mention odor sensitivity in January 1996 (Doc. No. 24-13, AR 3874).

In his IME report, Dr. Kent listed Dr. Beecher's report as one of the several materials he reviewed. (Doc. No. 24-16, AR 4854). Dr. Kent noted Dr. Beecher's incorrect July 23, 2003 summary that Himes's medical records did not mention sensitivity to odors until March 2003, seven years after his high dose chemotherapy. (*Id*., AR 4860). However, Himes fails to show that

this was a substantive mistake that led to Dr. Kent's ultimate conclusion. In the IME report, Dr. Kent cited Himes's history statement that was prepared by Himes in 2000, where Himes's extreme odor sensitivity problem developed after receiving high dose chemotherapy and stem cell transplant in 1996 and that his odor sensitivity problem caused the same types of symptoms as did his IBS, with the addition of difficulty breathing and his intoleration to fragrances from grooming and cleaning products. (*Id.*, AR 4856-57). Dr. Kent also reported Himes's current complaints concerning his sensitivity to odors. (*Id.*) Although Dr. Kent cited Dr. Beecher's incorrect summary, Dr. Kent also noted that Dr. Salomon, a Psychiatrist, opined in August 1997 that Himes had symptoms of a somatization disorder, that Dr. Magee opined in November 1997 that depression was causing his somatization, and that Dr. Doss opined in May 2003 that Himes suffered from severe sensitivity to odors secondary to high dose chemotherapy. (*Id.*) Dr. Kent's impression was that Himes's psychological problems (anxiety and somatization disorder) were his primary issues and that, while he had some sensitivity to odors and IBS symptoms, most of his problems were psychiatric. (*Id.*, AR 4860-61). Dr. Kent opined:

> It is my opinion Mr. Himes' physical limitations are minimal. I do not think he requires any limitations secondary to his physical symptoms from IBS and strong sensitivities to smell. He may need limitations secondary to his psychiatric problems, but I would defer to a provider who specializes in psychiatry.

(*Id.*, AR 4861).

Dr. Kent does not mention the timing of Himes's sensitivity to odors as being significant or playing a factor. Dr. Kent cited a multitude of records, including those documenting somatization disorder in 1997, and concluded that sensitivity to odors would not be limiting. Whatever the origin of Himes's sensitivity to odors or when it manifested, Dr. Kent concluded that it was not limiting.

42

Himes's reliance on *Creech v. UNUM Life Ins. Co. of N. Am.*, 162 F. App'x 445 (6th Cir. 2006) and *Garner v. Aetna Life Ins. Co.*, No. 117CV01307JMSTAB, 2018 WL 953081 (S.D. Ind. Feb. 20, 2018), *order vacated in part*, No. 117CV01307JMSTAB, 2018 WL 4179051 (S.D. Ind. June 1, 2018) is misplaced. In *Creech*, the defendant provided inaccurate information about the plaintiff's job title and duties, which a third party relied on in making a transferable skills analysis that the defendant, in turn, relied upon in deciding to terminate the plaintiff's benefits. 162 F. App'x at 457-58. The defendant incorrectly characterized the plaintiff as a risk insurance manager, which was a senior executive-level position, instead of as a senior client manager, a mere staff-level position. *Id*. at 457. The Court found that the third party expressly relied upon the incorrect characterization. *Id*. at 458.

In *Garner*, an independent peer physician review found fault with the claimant's treating physicians for not pursuing alternative medical procedures, although they did explore such alternatives. 2018 WL 953081, at *13-14. The district court found that the reviewer's inaccuracies regarding alternative procedures were not "trivial or harmless" and that the reviewer's conclusion was inaccurate, thereby undermining a critical basis of the reviewer's--and the defendant's--decision. *Id*. at *14.

### c.     Dr. Kent and Dr. Brown's Analyses

Himes further argues that Dr. Kent's conclusion that the cause of his disabling conditions was psychological was in error because he does not have any psychological issues. (Doc. No. 29, PageID# 5659-60). After reviewing Himes's medical records and examining him, Dr. Kent opined that Himes's physical limitations were minimal, that anxiety and somatization disorder were his primary issues, and that, while he had some sensitivity to odors and IBS symptoms, most of his

43

problems were psychiatric. (Doc. No. 24-16, AR 4860-61). Dr. Kent believed that it would be difficult to treat Himes's psychiatric conditions because of Himes's entrenched belief that his condition was all physical, and as a result, Dr. Kent did not believe that Himes would be compliant with psychiatric treatment. (*Id.*, at 4861). Dr. Kent opined that Himes did not require "any limitations secondary to his physical symptoms from IBS and strong sensitivities to smell." (*Id.*) Dr. Kent, who is not a psychiatrist, stated that Himes "may need limitations secondary to his psychiatric problems but [he] would defer to a provider who specializes in psychiatry." (*Id.*)

In-house physician Dr. Peter Brown, a board-certified psychiatrist, agreed with Dr. Kent's assessment, stating "I conclude to a reasonable degree of medical certainty that the available information does not provide evidence of a clear psychiatric diagnosis or any related restrictions or limitations. As noted by the examiner, psychiatric consultation and recommended treatment may be helpful to the claimant." (*Id.*, AR 4871). Dr. Brown's opinion is consistent with Dr. Kent's. Thus, Provident reasonably relied on Dr. Kent's IME report.

### 9. Conflict of Interest Based on Alleged Factual Misstatements

Himes argues that Provident's customer relations department refused to address the false information Dr. Kent cited in the IME report and that this refusal prevented him from receiving a full and fair review of his appeal and demonstrated Provident's conflict of interest. (Doc. No. 29, PageID# 5661).

A court does not have to address a defendant's potential conflict of interest in determining eligibility for benefits when the review is de novo. *Smith*, 260 F. Supp. 3d at 893 (citing *Conway*, 34 F. Supp.3d at 730); *Kaye v. Unum Grp./ Provident Life & Acc.*, No. 09-14873, 2012 WL 124845, at *6 (E.D. Mich. Jan. 17, 2012) ("[T]he Court has found that Provident Life's denial of

benefits should be reviewed under a *de novo* standard which gives no deference to the decision by this insurer. Thus, any conflict of interest that may have adversely affected the determination by Provident Life of the claim is not relevant here.") (footnote omitted); *Quarles v. Hartford Life & Accident Ins. Co.*, No. 3:15-CV-372-DJH-CHL, 2018 WL 523211, at *2 (W.D. Ky. Jan. 23, 2018) (collecting cases); *Guy v. Sun Life Assurance Co. of Can.*, No. 10-cv-12150, 2010 WL 5387580, at *1 (E.D. Mich. Dec. 22, 2010) ("Here, there is no dispute that Defendant operated under a structural conflict of interest. However, that conflict of interest only becomes relevant as a factor to weigh in determining whether Defendant abused its discretion in denying Plaintiff's claim. If the standard of review is *de novo*, Defendant's decision-making, and its conflict of interest, becomes irrelevant."). In any event, the Court has previously addressed the allegations concerning the incorrect information being cited in Dr. Kent's IME report and has found such occurrence inconsequential. Accordingly, the Court finds this contention is without merit.

### 10. Challenge to Provident's November 2, 2017 Appeal Decision

Himes rehashes much of the same repetitive allegations that the Court has already addressed in subsections one through nine of this Memorandum. Himes objects to the reasons for affirming the denial of his LTD benefits as set forth in Provident's November 2, 2007 appeal decision letter, citing (1) the IME report's improper reliance on the incorrect statement in Dr. Beecher's medical report that led to the conclusion that Himes's disabling conditions are psychological; (2) that the letter stated that he was not receiving appropriate care by a physician, although Provident waived the APS, despite there being no policy provision to waive the APS; (3) that, although Dr. Doss's 2009 APS stated that he could engage in activity "as tolerated", it failed to mention that Dr. Doss also stated that he had not returned to his prior level of functional ability,

45

improvement was not expected in the patient's functional abilities, and prognosis for improvement was poor, all indicating a conflict of interest; (4) that the RSA required Provident to give significant weight to the award of SSDI benefits; (5) that Provident improperly required an IME, even though his claim was not still pending because Provident had waived the APS in 2012; (6) that Provident improperly dismissed Dr. Doss's May 17, 2017 letter; (7) that Provident's failure to read his file and appeal before making its decision prevented him from receiving a full and fair review; (8) that Dr. Kent's belief that Himes did not require any limitations secondary to his physical symptoms from IBS and strong sensitivities to smell was contradicted by his own IME report and the fact that Himes had received disability benefits for over 20 years; (9) that the letter improperly stated that he was in breach of contract for not providing Provident with ongoing proof of loss, which was contradicted by Provident's paying him benefits after it waived the APS in 2012; and (10) that Provident improperly wanted objective evidence and/or records documenting his disabling conditions, stating that his subjective, self-reporting did not qualify as proof of loss, which violated the RSA. (Doc. No. 29, PageID# 5661-67).

Provident asserts that Himes failed to comply with his contractual requirements, including his (a) "receiving care by a physician which is appropriate for the condition causing the disability," (b) providing proof of loss establishing his disability under the current standard of "any gainful occupation", and (c) submitting to an IME, at Provident's request, and that any one of these failures constituted a legitimate basis to terminate benefits. (Doc. No. 30, PageID# 5758). In addressing the plan's physician care requirement, Provident cites *Reznick v. Provident Life and Accident Ins. Co.*, 181 F. App'x 531 (6th Cir. 2006) in support.

In *Reznick*, the Sixth Circuit affirmed the district court's conclusion that the claimant was not receiving appropriate care for bipolar disorder as required by the contract. 181 F. App'x at 532. Like here, the plan imposed one of the following conditions for coverage: "You are receiving care by a Physician which is appropriate for the condition causing the disability. We [Provident] will waive this requirements [sic] when continued care would be of no benefit to you." *Id.* (alterations in the original). Claimant saw his treating physician five times over a two-year period, but he never sought intensive therapy, which was recommended by his psychiatrist. *Id.* at 533. In affirming the district court's decision, the Sixth Circuit agreed with the lower court's interpretation of the plan language that, "as a matter of law, '[a]ppropriate care requires a relationship between the severity of the symptoms and the level of care that is received.'" *Id.* at 534. The Sixth Circuit explained that "the district court's formulation of the relationship of appropriate care and disability merely rephrase[d] the requirement that to be eligible for benefits under the policy, one must both be totally disabled and receiving care that is appropriate for a person *who is totally disabled*." *Id.* at 534-35 (emphasis in original). The Sixth Circuit also agreed with the lower court's factual conclusion that, based on the claimant's limited physician care, the claimant was not totally disabled or was not receiving appropriate care for a disabling illness, thereby warranting a denial of benefits. *Id.* at 532, 535. Thus, "a patient must pursue all care that is appropriate for a person who is totally disabled." *Bruton*, 798 F. App'x at 903.

Here, Himes had not sought physician care since 2007. (Doc. No. 24-1, AR 66). Provident consistently stated that it was not waiving the need for continued physician care and the need for additional information and medical records if necessary. (Doc. No. 24-12, AR 3582-83; Doc. No. 24-5, AR 1527; Doc. No. 24-1, AR 109). Provident correctly noted in its November 2, 2017 appeal

letter: "It is not clear how you could have such disabling IBS yet not see a doctor for more than a decade. Regardless, your policy requires ongoing appropriate care." (Doc. No. 24-16, AR 4885). Provident asserts that the record shows that Himes refused to comply with the plan's provisions concerning proof of loss, physician care, or attendance at IMEs, and that no current proof of limitations exists. The Court finds Provident's contentions to be well taken. Additionally, for the reasons previously discussed herein, the Court finds the rest of Himes's allegations listed in this subsection to be without merit.

### 11. Provident's Communications with the TDCI

Himes asserts that he filed a formal written complaint with the TDCI and that Provident showed bias and conflict of interest and breached its fiduciary duty and obligation to conduct a full and fair review of his claim by never mentioning in its communications with TDCI the physician care waiver in its narratives unless forced to do so by Himes. (Doc. No. 29, PageID# 5667-68). As previously discussed, Himes fails to show that Provident breached a fiduciary duty in the context of ERISA through its correspondence with the TDCI. Further, Provident's communications with the TDCI have nothing to do with the review of Himes's appeal and the determination of benefits under the plan. The procedures for providing a claimant a reasonable opportunity for a full and fair review do not apply to correspondence between Provident and the TDCI. *See* 29 CFR § 2560.503-1(h)(2). Also, as previously discussed, Himes's allegations of conflicts of interest do not apply in this context. *See Smith*, 260 F. Supp. 3d at 893; *Kaye*, 2012 WL 124845, at *6. Moreover, not only did Provident address the relaxation of the APS with a full reservation of rights in its correspondence with the TDCI, but Provident also provided all relevant documentation and correspondence between the parties on this issue, including a copy of the plan.

48

(Doc. No. 24-12, AR 3495-3667). Accordingly, for these reasons, this statement of error is without merit.

### 12.    Objective Evidence and the RSA

Himes argues that Provident "returned to its previous practice of requiring [him] to provide objective medial evidence to confirm his disabling conditions," in violation of the 2004 RSA. (Doc. No. 29, PageID# 5669). The Court has previously discussed this issue. Provident informed Himes that it was upholding the termination of his LTD benefits because the IME did not support restrictions or limitations that would prevent him from engaging in any gainful occupation and that he was not receiving appropriate care by a physician as required under the plan. (Doc. No. 24-16, 4877-78). Provident did not require objective evidence from Himes. Provident only sought some evidence--any evidence--separate from Himes's own self-serving statements. In its appeal decision, Provident wrote:

> We understand Dr. Doss wrote a letter dated May 17, 2017 which indicated you could not work due to gastrointestinal problems and severe odor sensitivity. However, his letter was based on your self-report as you have not seen him since 2005. There are no medical records or testing to corroborate his statements or your own. Again, we remind you that the policy requires proof of loss. Claims are not paid based on an insured merely stating they have a medical condition. Such condition(s) must be supported by medical data, including, but not limited to, medical records, office notes, diagnostic testing, etc. It is not clear how you could have such disabling IBS yet not see a doctor for more than a decade. Regardless, your policy requires ongoing appropriate care.

(*Id.*, AR 4885).

The Court finds that Provident did not violate the RSA or the terms of the plan in requiring Himes to submit updated medical evidence showing total disability as defined by the plan. Accordingly, for the reasons previously discussed, this statement of error is without merit.

49

### 13. Discretionary Authority

Finally, Himes contends that the plan does not give Provident the discretion to determine disability. As previously determined by the Court, the plan does not provide discretionary authority to Provident, which Provident concedes, for claims benefits determinations, and, therefore, the de novo standard of review applies to Himes's claims in this action.

## IV. Conclusion

For these reasons, Himes's motion to include missing documents from the administrative record and to supplement the administrative record (Doc. No. 25) and motion for judgment on the administrative record (Doc. No. 28) will be DENIED.

ALETA A. TRAUGER
United States District Judge